## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SIMMONS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-1820 |
| | § | |
| T-MOBILE USA, INC., | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

This Fair Labor Standards Act case, 29 U.S.C. § 201 *et seq*. ("FLSA"), was filed

originally by Christopher Simmons as the putative representative of others in a

collective action to recover unpaid overtime wages under § 16(b) of the FLSA, 29

U.S.C. § 216(b).  Pending before the Court is Simmons's Motion for Conditional

Certification of Representative Class [Doc. # 14] (the "Motion"), asking the Court to

conditionally certify a representative class of "all current and former senior sales

representatives employed by T-Mobile" in Texas for the past three years.  Motion, at

2.[1]  Also pending before the Court are T-Mobile's Objections to and Motion to Strike

Christopher Simmons's Affidavit Offered in Support of Plaintiff's Motion for

---

[1]Briefing on the certification question includes Defendant T-Mobile USA, Inc.'s ("T-Mobile") Response ("Response") [Doc. # 21] and Appendices [Docs. # 22, # 23, # 24, # 25, # 26, # 27], Simmons's Reply ("Reply") [Doc. # 31], and T-Mobile's Sur-Reply [Doc. # 39] and Appendix thereto [Doc. # 40].

Conditional Certification of the Representative Class [Doc. # 29],[2] and T-Mobile's

Motion to Strike Portions of Plaintiff's Evidentiary Submission Filed with Plaintiff's

Reply in Support of the Motion for Conditional Certification [Doc. # 41].[3]  Finally, T-

Mobile has filed a Motion to Strike Reply to Response to Motion for Conditional

Certification [Doc. # 34], asking that Simmons's Reply [Doc. # 31] be stricken because

it introduces new affidavit evidence, or that in the alternative it be allowed to submit

a Sur-Reply [Doc. # 39].  These matters are now fully briefed and ripe for adjudication.

After reviewing the parties' submissions, all matters of record, and the relevant legal

authorities, the Court concludes that notice and conditional certification should be

**denied**.  The Court relies on the affidavits Simmons presents, including his own, only

insofar as they refer to matters pertaining to the affiant personally or to matters the

affiant establishes he personally observed while employed with T-Mobile.  More

detailed rulings are set forth as necessary.

## I.   <u>BACKGROUND</u>

As of October 2006, T-Mobile operated 113 retail stores in Texas.  At each

location, T-Mobile employs sales representatives, often including Senior Retail Sales

---

[2]This motion is directed to Simmons's Affidavit attached to the Motion [Exhibit A to Doc. #14].  Simmons has responded [Doc. # 32] and T-Mobile has replied [Doc. # 35].

[3]Simmons responded to this motion [Doc. # 42], and T-Mobile has replied [Doc. # 43].

Representatives ("SRSRs"), who report to a Retail Store Manager ("RSM"). The RSMs report to Regional Retail Managers ("RRMs") who in turn report to Regional Directors ("RDs").  There currently are thirteen RRMs and two RDs assigned to the state of Texas.  Response, at 1-2; Declaration of Cindy Cuneo ("Cuneo Decl."), Response Appendix, vol. III [Doc. # 25], at 83, ¶ 14.

SRSRs are paid more than entry-level sales people, called "retail sales representatives" ("RSRs"), and perform additional duties.  Each retail store may employ several SRSRs or none, at the discretion of the location's RSM.  Each retail branch's RSM is responsible for enforcing T-Mobile's corporate policies on a daily basis, as well as setting the store employees' work schedule.

SRSRs are promoted by the RSMs from among the ranks of the RSRs.  The parties rely on the declarations of Cindy Cuneo, T-Mobile's Divisional Human Resources Manager, Anthony Flanery-Rye, the company's Finance Manager, several SRSRs, and numerous RSMs.  Simmons also presents his own and several RSRs' affidavits.  The record makes clear that RSMs are guided by the company's nationwide written standards, set forth in a sheet entitled "SRSR Promotion," for promoting RSRs to SRSRs, but that RSMs are given discretion about who to promote and whether to promote anyone.  The Promotion Sheet sets forth minimum eligibility requirements, such as "the ability and . . . willingness to handle additional responsibilities."  SRSR

Promotion ("Promotion Sheet"), Response Appendix, vol. I [Doc. # 22], at 4; Reply, Exhibit 17.  Once given the SRSR position, according to T-Mobile's job description, an SRSR must "maintain a rolling average of a 100% to goal in sales 4 out of 6 months to keep his or her status."  SRSR Job Description 2004, Response Appendix, vol. 1 [Doc. # 22], at 1.  In addition to sales responsibilities an SRSR must also perform one or more duties "required to keep the operational and financial side of the business sound."  *Id*.; Affidavit of Christopher Simmons ("Simmons Reply Affidavit"), Reply, Exhibit 2, at 1; SRSR Job Description 2004, Reply, Exhibit 16, at 1.  Generally, SRSRs are required to meet the same sales quotas as the RSRs in the SRSRs' store.[4] Response, at 11 & Appendix materials cited in n.42.  An SRSR's additional duties are determined by his or her RSM, but generally fall within one or more of the following categories: assisting with maintaining the store's work schedule, opening and closing the store, inventorying and managing the store's stock, training RSRs, and handling minor managerial tasks if an RSM is not present.  *See, e.g.*, Reply, Exhibit 17; Declaration of Amber Smith, Reply, Exhibit 13, at ¶ 4; Declaration of Gary Freeman, Reply, Exhibit 12, at ¶ 4.  The amount of time needed for each of these duties varies depending on the store, the RSM and other factors.  *See, e.g.,* Declaration of Earl Seitz

---

[4]At least one RSM requires SRSRs to meet a higher sales quota.  *See* Declaration of James Smiers ("Smiers Decl."), Response Appendix, vol. IV, at 128, ¶ 6.

("Seitz Decl."), Response Appendix, vol. IV [Doc. # 25], at 117, ¶ 4; Declaration of Hector Garza ("Garza Decl."), *id.* at 122, ¶ 4.  The record establishes that sales people, including SRSRs and Simmons in particular, generally are required to attend one or more outside sales promotional events (called "outreaches") per month.  Simmons Reply Affidavit at 2.

In return for performing these sales and other duties, SRSRs receive an hourly wage increase and the opportunity to earn a monthly bonus if they meet their sales quotas.  *See* Promotion Sheet; Reply, Exhibit 17; Simmons Reply Affidavit at 1-2 (apparently referring to Exhibit 17).  SRSR status may be repealed if there is a "breach of the agreed upon duties or a reduction in sales performance."  Promotion Sheet; Simmons Reply Affidavit at 2.

Simmons testifies in his Reply Affidavit to the following:  In order to complete his duties as an SRSR, he consistently had to work 50 hours a week.  He discussed his need to work overtime with his supervisor, Rolanda Long, and with the assistant manager of his T-Mobile location, Terrance Hurst.  Simmons reports that Hurst stated that he unsuccessfully tried to get approval from Long for Simmons to work overtime.[5] Simmons also reports that he observed other SRSRs working past their scheduled shifts on a regular basis and concludes that they were not paid overtime.  He also states

---

[5]Simmons's description of these statements by Long and Hurst are not hearsay; they are admissions by a party opponent.  *See* FED. R. EV. 801(d)(2)(D).

generally that he had conversations with unnamed SRSRs while they were employed with T-Mobile, at training sessions and elsewhere, in which other SRSRs stated they were working overtime without being paid.[6]  Simmons does not provide any detail about these observations, such as how often he saw others work overtime, what he believed was overtime hours, or how he concluded that the overtime was uncompensated.  He argues that SRSRs working overtime to complete their duties without overtime compensation was a common experience in the last three years at T-Mobile locations in Texas.  Simmons also submitted an affidavit from Howard Hernandez, apparently a T-Mobile RSR,[7] who averred that he was told by T-Mobile management "that if we need to stay to meet our quotas then to stay, but that we were not to put it down as overtime, or else we would be written up."  Hernandez Affidavit, Reply, Exhibit 20.  Similarly, an affidavit from Stephen Thomas, an RSR, asserts that his store manager told him "to put the time that we worked on the Outreach Programs on the following week's time card because we would not get paid for overtime."

---

[6]Simmons offers this evidence for the truth of the matters asserted.  These SRSRs' statements were about the SRSRs' own duties and working conditions; Simmons's rendition of these statements is not hearsay.  *See* FED. R. EVID. 801(d)(2)(D); *Williams Chrysler F'n. Corp.*, 1999 WL 221119, *2 (E.D. La. April 9, 1999) (citing MICHAEL H. GRAHAM, FEDERAL PRACT. AND PROC.: EVIDENCE § 6723, at 184-88 (2d ed. 1997)).

[7]The Court deduces that Hernandez is not an SRSR because he does not specifically identify himself as such.

Thomas Affidavit, Reply, Exhibit 20, at 1.  Simmons presents no affidavits from any SRSRs.

T-Mobile counters that it promotes to the SRSR position only exemplary sales personnel who have are skilled enough to meet or exceed the 100% sales quotas while working a "normal 35-38 hour week."  Response, at 11.

T-Mobile also explains that it has official corporate policies intended to control and record its employees' working hours.  T-Mobile maintains that it consistently and unequivocally instructs its employees to record the hours they work, including all overtime hours.  According to a handout marked for inclusion "with any new hire orientation," employees must obtain a supervisor's authorization to work overtime hours and must record that time even if it was worked without prior approval.  Wage & Hour Essential Information for Hourly Employees ("Essential Information"), Response Appendix, vol. III [Doc. # 24], at 87.  The Essential Information provides that employees shall "be paid for all time worked" and that employees "should never work 'off the clock.'"  *Id*.  "T-Mobile strictly prohibits non-exempt employees from working 'off-the-clock,' meaning without pay.  No employee may request or allow non-exempt employees to work off-the-clock or without accurately recording all actual hours and minutes worked, or to falsify or inaccurately alter or prepare any time records."  T-Mobile Employee Handbook ("Employee Handbook"), Response

Appendix, vol. III [Doc. # 24], at 92.  T-Mobile's formal overtime policy further states an employee's working unapproved overtime hours "may lead to termination." Essential Information, at 87.

T-Mobile's Texas employees inform the company of the hours worked by means of a computer application called "MyVoice," which, according to T-Mobile, displays the following "prompt" whenever an employee enters his time:

> By pressing the 'Save and release' button, I certify that I have accurately recorded all hours that I have worked or taken as time off in accordance with [company] policy.  I understand I am subject to discipline, up to and including termination, if I have failed to record or have misrepresented any information on my time sheet.[8]

Response, at 5 (*citing* New Hire Orientation Packet, Response Appendix, vol. I [Doc. # 22], at 27).[9]

T-Mobile argues that, within these general written policies, RSMs have "the day-to-day responsibility for all store operations and personnel matters.  RSMs, according to T-Mobile, administer and enforce T-Mobile's policies, including its procedures and rules regarding the proper recording of all time worked and prohibiting "off the clock

---

[8]According to the affidavits of T-Mobile employees submitted by the parties, the system is now called "My Work Life."  *See, e.g.*, Affidavit of Rolanda Long, Response, Exhibit 18, ¶ 10.  There is no indication that the "prompt" on which T-Mobile relies has changed.

[9]The screenshot included in the exhibit is partially obscured by explanatory text. Simmons has not objected to T-Mobile's characterization of the wording of the prompt, and the Court accepts T-Mobile's version as true for the purposes of the Motion.

work." Response, at 5, 21 (citing to various declarations by RSMs and other T-Mobile supervisory personnel).

T-Mobile also urges that RRMs and RDs, the RSMs' direct and indirect supervisors, are not present in each location, and these upper-level supervisors' influence on RSMs' application of store policies varies "depending on the personality and/or management style of the individuals employed." *Id.* at 6. It is up to individual RSMs to schedule their RSRs and SRSRs' work hours and to approve or disapprove overtime as they deem necessary.

T-Mobile gives its RSMs "suggested [sales] quotas" for the location and its sales staff, but the RSMs "may adjust that quota according to market factors." *Id.* at 21 and citations therein. RSMs also have discretion to grant their SRSRs leeway by not taking corrective action if an SRSR fails to meet a quota or neglects supplemental duties. *Id.* The nature of any particular SRSR's supplemental duties depends on the supervising RSM's discretion, the SRSR's stated career goals, the number of SRSRs available at the location, and whether the location employs an Assistant Retail Sales Manager. *Id.*

There appears no dispute that T-Mobile considers the SRSRs' additional responsibilities supplementary and these responsibilities consume far less time than SRSRs' primary task of selling T-Mobile products. *See* Cuneo Decl. at 82, ¶ 12 ("Performance of those additional duties should always be prioritized second to

selling.").  The evidence from different RSMs reveals that these duties can take as little as two hours a week and as much as seven to ten hours.  *See* Garza Decl. at 121, ¶ 4; Declaration of J.R. Sanchez ("Sanchez Decl."), Response Appendix, vol. IV [Doc. # 25], at 133, ¶ 4.  The time required depends on numerous circumstances, as discussed below.  Simmons argues in reply, without any independent admissible evidence, that his situation is typical of many SRSRs at T-Mobile in Texas.  Simmons accordingly proposes a FLSA conditional class comprised of all current and former SRSRs in Texas who worked at T-Mobile within the last three years.  He acknowledges that SRSRs' additional duties vary from store to store and among SRSRs a result of RSMs' discretion over each location and each SRSRs' assignments.  Simmons argues nevertheless that all Texas SRSRs' circumstances are substantially similar because it is paramount to T-Mobile that SRSRs make their sales quotas (SRSRs must meet 100% of the location's sales quotas four out of six months), that meeting T-Mobile's sales quotas is a full time job, and that T-Mobile requires the SRSRs to work uncompensated overtime to complete their additional non-sales duties.

## II.    CONDITIONAL CERTIFICATION STANDARD

Section 16(b) of the FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become

such a party and such consent is filed in the court in which such action is brought." 29

U.S.C. § 216(b).  A representative action brought pursuant to this provision follows an

"opt-in" rather than an "opt-out" procedure.  *See Mooney v. Aramco Services Co.*, 54

F.3d 1207, 1212 (5th Cir. 1995) (overruled on other grounds by *Desert Palace, Inc. v.

Costa*, 539 U.S. 90, 90-91(2003)).[10]  District courts have the discretion to implement

the collective action procedure by facilitating notice to potential plaintiffs.  *See

Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989).

The Fifth Circuit has not specifically addressed the meaning of "similarly

situated" in this context.  In *Mooney*, the Fifth Circuit reviewed two methodologies

courts have used in deciding this question.  The Court adopts the procedure enunciated

in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987) (an Age Discrimination in

Employment Act ("ADEA") case; the FLSA incorporates the ADEA procedures).

Under this process, "the trial court approaches the 'similarly situated' inquiry via a

two-step analysis."  *Mooney*, 54 F.3d at 1213 (an ADEA case).[11]

---

[10]Although *Mooney* was litigated under the ADEA, the ruling applies in this FLSA case because the ADEA explicitly incorporates § 16(b) of the FLSA.  *See Mooney*, 54 F.3d at 1212.

[11]The second methodology is typified by *Shushan v. University of Colorado*, 132 F.R.D. 263 (D. Colo. 1990).  This approach adopts the view that the "similarly situated" inquiry is coextensive with Rule 23 class certification.  Therefore, using this methodology, the courts look at numerosity, commonality, typicality, and adequacy of representation to determine whether a class should be certified.  *Mooney*, 54 F.3d at

(continued...)

The Court at the "notice stage" determines "usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members." *Mooney*, 54 F.3d at 1213-14.  As noted in *Mooney*, "[b]ecause the court has minimal evidence, this determination is usually made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id*. at 1214. The *Mooney* court observed: "At this notice stage, "[district] courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan. . . ." *Id*. at n.8 (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part and appeal dism'd in part*, 862 F.2d 439 (3d Cir.. 1989)), *aff'd and remanded sub nom Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S.

---

[11](...continued)

1214.  The Fifth Circuit in *Mooney* found it unnecessary to decide which of the two methods was appropriate.  However, in *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286 (5th Cir. 1975), the Fifth Circuit found a "fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 16(b)" because Rule 23 provides for "opt-out" class actions and § 16(b) provides for "opt-in" class actions.  *Id*. at 288.  The Circuit stated that "it is crystal clear that § 16(b) precludes pure Rule 23 class actions in FLSA suits."  *Id*.  The two-step *Lusardi* process has the advantage of informing the original parties and the Court of the number and identity of persons desiring to participate in the suit.  With that information, the parties may ascertain the facts relevant to viability of a collective action and the Court may decide pertinent issues.

165 (1989)).[12]  Notably, in *Mooney*, the Fifth Circuit did not articulate a definitive standard or method of proof that would justify granting conditional certification or notice to the potential class members.  That court, in discussing the "similarly situated" analysis for a representative class, recognized the need for "ad hoc analysis on a case-by-case basis," and did not reach nuanced issues about what proof was appropriate when using the *Lusardi* methodology.  *Id.* at 1216.[13]

Subsequent to *Mooney*, most district courts in this Circuit as a practical matter require some factual basis to the plaintiff's allegations that a collective action is warranted before granting notice and conditional certification.  *See, e.g., Aguirre v. SBC Communications, Inc.* 2006 WL 964554, at *5 (S.D. Tex. Apr. 11, 2006) (citing *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983) ("plaintiffs have the burden of demonstrating a reasonable basis for crediting their assertions that aggrieved

---

[12]In the quoted phrase, the district court in *Sperling* discussed what proof it perceived most district courts were requiring at the time.  *Sperling*, 118 F.R.D. at 407 ("In general, however, courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination.").

[13]The *Mooney* court actually held merely that the district court did not abuse its discretion in finding, after full discovery (*i.e.*, at the second stage), that the "opt-in" plaintiffs were *not* similarly situated.  *Id.* at 1216.  It is noted also that the *Mooney* decision was issued after 154 plaintiffs had opted in, after decertification of the class, and after trial on the merits.  The court of appeals emphasized that it does "not endorse the methodology employed by the district court and do not sanction any particular methodology" and "leave[s] the inquiry for another day."  *Id.*

individuals existed in the broad class that they proposed")); *Bursell v. Tommy's Seafood Steakhouse, et al*, 2006 WL 3227334, *2 (S.D. Tex. Nov. 3, 2006); *Hall v. Burk*, 2002 WL 413901, *3 (N.D. Tex. Mar. 11, 2002); *Donohue v. Francis Services, Inc.*, 2004 WL 1161366, (E.D. La. May 24, 2004). Ultimately, there must be "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Aguirre*, 2006 WL 964554, at *5 (citing *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003)). "'A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice.'" *Id.* (citing *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *Barron*, 242 F. Supp. 2d at 1104). A plaintiff must allege a common policy or plan and "make a 'modest factual showing sufficient to demonstrate that [he or she] and potential plaintiffs together were victims of a common policy or plan that violated the law.'" *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F. Supp. 2d 91, 96-97 (S.D.N.Y. 2003) (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)).

The second stage is typically precipitated by a motion for "decertification" by the defendant after discovery is largely complete. *Mooney*, 54 F.3d at 1214. If the additional claimants are similarly situated, the district court allows the representative

action to proceed.   If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice.  *Id.*

The *Aguirre* court adopted a three part analysis for considering at the notice stage whether there should be conditional certification of a FLSA collective action. The Court concludes this approach makes sense and will be used here.  There must be a "minimal showing by the plaintiff that (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt-in to the lawsuit." *Aguirre*, 2006 WL 964554, at *6.

## III.   ANALYSIS

### A.   Evidence of Others' Injury

Simmons has produced evidence that other aggrieved individuals exist, but the evidence is largely about RSRs, not SRSRs, his job category.  Simmons has presented only his own affidavit (Reply, Exhibit 2) as admissible evidence about other SRSRs working uncompensated overtime, and that evidence is somewhat vague.  *Compare Haynes*, 696 F.2d at 887 (plaintiffs failed to present any evidence whatsoever that there were other aggrieved employees, leaving only "counsel's unsupported assertions that FLSA violations were widespread"); *see Aguirre*, 2006 WL 964554, at *6.  The Court

nevertheless will assume without deciding that Simmons has established "a reasonable basis for crediting the assertions that aggrieved individuals exist." *Aguirre*, 2006 WL 964554, at *6.

### B.   <u>"Similarly Situated" Potential Class Members</u>

To be entitled to conditional certification at this preliminary stage of the litigation, Simmons must show that he is similarly situated to the proposed class members.[14]  Simmons characterizes his proposed class as "narrowly drawn" because the members share the same T-Mobile job title and perform the same general duties, namely, "meeting their assigned quota while performing identified management tasks." Reply, at 10.  It is uncontroverted that the proposed class would comprise SRSRs, one of T-Mobile's official job titles.  Simmons theorizes that T-Mobile's fundamentally inconsistent policies—maximizing sales and minimizing overtime—conflict to the SRSRs' detriment and cause SRSRs to believe that if they cannot meet their quotas without working overtime, they are required to work uncompensated overtime hours. He premises his theory on the contentions that meeting sales quotas requires full-time work; that there are, in his view, only a limited number of additional duties assigned to

_____

[14]*Aguirre* suggests that a plaintiff must show that he is similarly situated to prospective "aggrieved" class members who are a formally recognized class of individuals within the company.  *Aguirre*, 2006 WL 964554, at *6.

SRSRs; and that these duties—whatever they are—must be done during uncompensated overtime hours.

It is uncontested that T-Mobile discourages supervisors from authorizing sales people to work overtime.[15]  *See* Employee Handbook, at 92.  It also is true that all Texas SRSRs perform similar duties in that all Texas SRSRs are responsible for performing the same primary task, selling T-Mobile's product.  "[T]he goal of every SRSR is to generate the highest possible sales for the Company."  Declaration of Autumn Benavides, Response Appendix, vol. V [Doc. # 26], ¶ 11.  *See also* Cuneo Decl. at 82, ¶ 13 ("Like all employees within T-Mobile stores, SRSRs are required to reach a minimum sales quota each month."); Declaration of Monique Savory, Response Appendix, vol. IV [Doc. # 25], at 113-12, ¶ 11.

There also is no question that T-Mobile promulgates sales quotas that all sales staff are expected to meet.  *See, e.g.,* Promotion Sheet; Simmons Reply Affidavit at 2. The size of the quotas, however, vary by store, by month, with the number of employees in the store, with past store performance, and with other factors.  The quota requirements that RSMs impose on their SRSRs also vary widely.  Some RSMs require "125% of sales" (Garza Decl. at 123, ¶ 5), others expect the SRSR to attain 115–20%

---

[15]T-Mobile's official policy is that any employee who does work overtime must record it and be compensated for it, even if it was unauthorized.  *See, e.g.,* Essential Information, at 87.

of the quota (Smiers Decl. at 128, ¶ 6), and others expect 100% of sales (*e.g.*, Declaration of Charlettee Washington ("Washington Decl."), Response Appendix, vol. IV [Doc. # 25], at 111, ¶ 6; Seitz Decl. at 118, ¶ 5; Declaration of Anthony Flanery-Rye ("Flanery-Rye Decl."), Response Appendix, vol. III [Doc. # 24], at 78, ¶ 7).   At least one SRSR is required to meet only 50% of the official quota.  *See* Seitz Declaration, at 118, ¶ 6.  Also, the RSMs also have individual discretion as to when to penalize or take corrective action, and their approaches vary.  *See, e.g.,* Cuneo Decl. at 82 ¶ 13 ("Corrective action *can* be taken by the RSM if an SRSR consistently fails to meet 'Minimum Expectation.'" (emphasis added)); Garza Decl. at 123, ¶ 5 (SRSR who "has averaged 15-20% below quota for between 4 and 6 months" has "never [been] subjected . . . to corrective action.").

Simmons nevertheless has not persuaded the Court that the potential conflict between the sales quotas and policy discouraging overtime affects SRSRs in different stores equally, or even a meaningful number of SRSRs.  It is therefore not apparent that there are similarly situated SRSRs that would justify notice to a potential class.  At its most general level this is a case involving claims of "off the clock" unpaid overtime, where allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate Defendant's clear, lawful written policies at some or many of Defendant's more than one hundred different retail locations.  While

collective actions have been conditionally certified in off-the-clock cases, and in cases with employees at various locations, and in cases where a defendants' written policies were commonly violated in practice, the Court has located no case in which conditional certification was ordered when there were as many variables as presented in the matter at bar.  Indeed, the facts of each reported case were materially different from those here.  *See, e.g., Clarke v. Converges Customer Management Group, Inc.*, 370 F. Supp. 2d 601 (S.D. Tex. 2005); *Villatoro v. Kim Son Restaurant, L.P.*, 286 F. Supp. 2d 807 (S.D. Tex. 2003); *Quintanilla v. A & R Demolition, Inc.*, 2005 WL 2095104 (S.D. Tex. Aug. 30, 2005).  In sum, Simmons has not presented persuasive evidence that it is likely that T-Mobile has a common plan or practice, implemented through RSMs, requiring SRSRs to work uncompensated overtime at many of its locations in Texas.

Simmons has presented his own affidavit, four declarations from T-Mobile RSRs, fifteen declarations of RSMs in Texas, and several other affidavits.[16]  The RSRs describe their own experiences being denied permission to work overtime and denied payment for overtime hours they worked.  *See* Reply, Exhibits 20, 21, 22, 24.[17]  It is

---

[16]The RSM and two other declarations were submitted originally by T-Mobile.

[17]Simmons also submits four affidavits from private investigators.  Reply, Exhibits 26, 27, 28, 29.  The investigators describe conversations with four T-Mobile employees who reportedly stated that the company's sales people are required to work uncompensated overtime hours and that T-Mobile sent one or more emails informing employees not to discuss overtime matters with outsiders.  The investigators' affidavits
(continued...)

clear that T-Mobile discourages employees from working overtime and that supervisors often denied pre-approval for requested overtime.[18]  There is however no admissible proof from or about any specific SRSR other than Simmons (and his overly general statements about others) that supports his claims that *SRSRs* commonly work unpaid overtime.  To the contrary, a review of the fifteen affidavits from RSMs and four SRSRs in the record establishes that the RSMs are willing to grant  permission for SRSRs to work overtime and paid overtime wages when necessary for specific tasks. *See, e.g.*, Seitz Decl. at 120, ¶ 10 (SRSR in Seitz's store worked "a considerable amount of overtime because we were short-staffed" and was compensated accordingly); Declaration of Adam Steenbergen ("Steenbergen Decl."), Response Appendix, vol III, at 66, ¶ 10 (SRSR worked overtime "assisting in opening a new store").

_____

(...continued)
are inadmissible hearsay.  Plaintiff does not explain the circumstances of the investigators' conversations with these employees or why the employees—who are named by the investigators—did not submit their own affidavits or opt into the case.

[18]The fact that RSMs also aver that they paid RSRs overtime for all hours worked does not defeat Simmons's claims, but merely creates fact issues on the merits of those claims.

Furthermore, a close review of testimony from the RSMs[19] establishes the following matters that undermine Simmons's collective action request:  RSMs have differing approaches to deciding if SRSRs were necessary in their stores, although only RSRs who have consistently exceeded their sales quotas are eligible.  The RSMs also have discretion regarding what in-store additional duties and what outreach responsibilities to assign to any SRSR.  These decisions vary with the RSMs' perceptions of their stores' respective needs and the skills and goals of the SRSRs each RSM supervised.  There is a dearth of evidence that all, or even many, SRSRs perform sufficiently similar work.  While the additional duties fall into broad categories, such as taking inventory, opening and closing the store, supporting and training RSRs, processing returned merchandise, ensuring the store is properly stocked, assisting in team meetings, performing leadership roles for other employees, and maintaining the store's work schedule, the frequency and specifics of the assigned duties vary from SRSR to SRSR within stores and from store to store.  Some RSMs obtain substantial input from each SRSR, while other RSMs do not.  Some assignments are dependent upon whether or not an SRSR has a goal of moving into higher management.  There also are wide variations in the amount of time each SRSR's additional duties consume.

---

[19]Response Appendix, vols. IV, V, VI, at 103-181.  *See also* Simmons Reply Affidavit at 2-3; Cuneo Decl. at 82, ¶ 12; Flanery-Rye Decl. at 77, ¶ 6.

Furthermore, contrary to Simmons's assertions, the additional duties assigned to SRSRs are varied, some being complex while others are straightforward, some being time-consuming (*i.e.*, 1-2 hours a day) while others take minimal time (*i.e.*, a few minutes a day), some arising frequently while others are needed only occasionally. T-Mobile characterizes the average SRSR's duties as light enough that an SRSR "can easily complete all of his or her work within a normal 40-hour week." *See* Response, at 9 n.29 (containing citations to nine RSM and four SRSR affidavits). One RSM estimated that an SRSR in his store spent seven to ten hours per week on supplemental duties. *See* Garza Decl. at 122, ¶ 4.) Some RSMs plan for the extra tasks to take only two and a half hours per week. *See* Sanchez Decl. at 133, ¶ 4. One SRSR reported that his additional duties took "20% of my scheduled time per week," Steenbergen Decl. at 65, ¶ 6, and another that the "time spent on additional duties varies from week to week," Declaration of Lester Cruz, Response Appendix, vol. III, at 67, ¶ 6. Simmons has not adduced any probative independent evidence that these supplementary tasks—in addition to the sales duties — typically require other SRSRs to work more than forty hours per week and thus that SRSRs (as a group or in substantial numbers) are required by RSMs to work uncompensated overtime.

Other significant evidence in the record belies Simmons's contentions. The evidence (other than Simmons's testimony) is uncontradicted that SRSRs are chosen

from among the best sales personnel who have no trouble meeting their sales quotas in less than 38 hours a week.  *See* Flanery-Rye Decl. at 77, ¶ 6; Washington Decl. at 109, ¶ 4; Seitz Decl. at 116, ¶ 3; Declaration of Erika Salazar ("Salazar Decl."), Response Appendix, vol. III, at 72, ¶ 7; Declaration of Marisela Lopez ("Lopez Decl."), *id*. at 74, ¶ 8.  Simmons's proof from RSRs complaining of T-Mobile's overtime practices, *see, e.g,* Hernandez Affidavit, Reply, Exhibit 20, is not probative.  SRSRs are selected for promotion from the ranks of RSRs specifically because of the individuals' exemplary salesmanship abilities.  *See* Flanery-Rye Decl. at 77, ¶ 6; Washington Decl. at 109, ¶ 4; Seitz Decl. at 116, ¶ 3; Salazar Decl. at 72, ¶ 7; Lopez Decl. at 74, ¶ 8.

Simmons has not demonstrated that RSMs (or their supervisors, RRMs and RDs) in Texas (or any region thereof) have a common practice or plan to require SRSRs to work uncompensated overtime.  Simmons accordingly has not shown that there is a factual or legal issue that predominates over the potential individual issues , such as the time necessary for a particular SRSR to perform his or her primary selling duties to make quota, whether making quota is required by the RSM at that location, what particular supplemental tasks the SRSR was assigned, and what time is necessary for the SRSR each week to perform the supplemental tasks in the aggregate.  This is a case where "the differences among [class members] predominate over their

similarities and will require individual inquiry at trial." *See Aguirre*, 2006 WL964554, at *7.

Simmons thus has not met his "fairly lenient" burden to allege, with a factual basis, that he and the potential plaintiffs together were victims of a common policy or plan that violated the law. *See Mooney*, 54 F.3d at 1214; *Gjurovich.*, 282 F. Supp. 2d at 96. He has not demonstrated that there are meaningful "identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Aguirre*, 2006 WL 964554, at *5. While Simmons has evidence that at least some Texas RSRs have been required to work overtime hours and either to report them as regular scheduled hours or not to report the hours at all, *see, e.g.*, Declaration of Stephen Thomas, Reply, Exhibit 21; Declaration of Marvin Stafford, Reply, Exhibit 24, he has no independent admissible evidence from or about SRSRs whom he seeks to represent. Simmons's own personal observations are insufficient in the circumstances of this case (with 113 different T-Mobile locations and over a hundred supervisors) to constitute meaningful proof, even under a lenient standard, that raises an inference that the T-Mobile Texas SRSRs are "similarly situated" as to unpaid overtime claims for FLSA conditional certification purposes.[20]

## C.    Other Similarly Situated Individuals' Interest in Joining the Suit

---

[20]This preliminary ruling is not a finding that SRSRs typically work overtime or that they are denied overtime compensation.

Various courts require proof of a third criterion for conditional certification, namely, that there be evidence that other similarly situated individuals wanted to opt in to the lawsuit. *See Haynes v. Singer Co., Inc.*, 696 F.2d at 887; *Dybach v. State of Fla. Dept. of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991); *H & R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358 (M.D. Ala. 1999); *D'Anna* v. *M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995); *Aguirre*, 2006 WL 964554, at *6; *Quintanilla*, 2005 WL 2095104, *13, and cases cited therein.[21]   The Fifth Circuit has not addressed this factor, presumably because generally there are multiple plaintiffs or several current or former employees that seek to join the suit and provide affidavits in support of the conditional certification.

The Court concludes that a showing is necessary that at least a few similarly situated individuals seek to join the lawsuit.   Others' interest in joining the litigation is relevant to deciding whether or not to put a defendant employer to the expense and effort of notice to a conditionally certified class of claimants in a collective action. *See, e.g., H & R Block*, 186 F.R.D. at 400 (explaining that "whether affidavits of potential plaintiffs were submitted" is one of several factors that courts *may* consider).

---

[21]This criterion is not discussed in either *Aguirre*'s analysis of the current law on conditional certification, *see id.* at *4-*6, or the court's ruling denying conditional certification, *see id.* at *6-*8, because the court did not need to reach the issue.

Affidavits from potential class members affirming their intention to join the suit are ideal for an analysis of whether "the putative class members were together the victims of a single decision, policy, or plan." *See Mooney*, 54 F.3d at 1214 n.8. However, affidavits *per se* are not required and a named plaintiff may submit some other form of evidence that the additional aggrieved persons exist and want to join the suit. In *Dybach*, 942 F.2d at 1568, the Eleventh Circuit explained that a district court "should satisfy itself that there are other employees of the department-employer who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *See also Haynes*, 696 F.2d at 887 (the plaintiffs failed to present either affidavits of potential opt-in class members or any evidence whatsoever that there were other aggrieved employees; "counsel's unsupported assertions that FLSA violations were widespread and that additional plaintiffs would come from other stores" were insufficient); *D'Anna*, 903 F. Supp at 894 (affidavits are advisable so an employer should "not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense").

Simmons has not presented any admissible evidence that other current or former aggrieved T-Mobile SRSRs seek to participate as plaintiffs in this case. Simmons reliance on merely his own allegations that the putative class members exist and

together were the victims of a single decision, policy, or plan is insufficient to meet his burden on this third criterion for conditional certification and notice.

IV.    **CONCLUSION**

Simmons has not established a sufficient basis for the Court to conclude that notice of this collective action should be sent to all SRSRs in Texas. Simmons has not demonstrated, in light of the numerous variables presented in T-Mobile's business at 113 locations in Texas, that this case is appropriate for collective action treatment on claims that T-Mobile's Texas managers in practice violate company policies at numerous locations by mandating that SRSRs perform work off-the-clock, and that the extra work results in the SRSRs working more than forty hours per week, which overtime is uncompensated. The Court declines to conditionally certify this case as a collective action. It is therefore

**ORDERED** that Simmons's Motion for Conditional Certification of a Representative Class [Doc. # 14] is **DENIED**. It is further

**ORDERED** that T-Mobile's Objections to and Motion to Strike Christopher Simmons's Affidavit Offered in Support of Plaintiff's Motion for Conditional Certification of the Representative Class [Doc. # 29] is **DENIED in part** and **GRANTED in part**. It is further

**ORDERED** that T-Mobile's Motion to Strike Portions of Plaintiff's Evidentiary Submission Filed with Plaintiff's Reply in Support of the Motion for Conditional Certification [Doc. # 41] is **DENIED in part and GRANTED in part**.

**SIGNED** at Houston, Texas, this **24th** day of **January**, **2007**.

Nancy F. Atlas
United States District Judge